in respect to the issues involved in this litigation. Such witnesses were in conference with the defendant in respect to the adjustment of the contract which it had entered into with the Drake Hardware Company, and in no way represented any party to this litigation so far as the contract here is involved.

It follows that the judgment appealed from should be affirmed, with costs.

Judgment affirmed, with costs. All concur, except ROBSON, J., who dissents.

---

BAIRD v. ERIE R. CO. et al.

(Supreme Court, Equity Term, Erie County.    May, 1911.)

1. REFORMATION OF INSTRUMENTS (§ 45*)—EVIDENCE—SUFFICIENCY.

A plaintiff suing to reform a contract must establish his case by clear and convincing evidence.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 157–193; Dec. Dig. § 45.*]

2. REFORMATION OF INSTRUMENTS (§ 45*)—EVIDENCE—SUFFICIENCY.

In a suit to reform a contract for special switching rates for furnaces on a tract of land, evidence *held* to show that all the parties understood that the switching rates should apply to two furnaces, by whomsoever operated, justifying the reformation of the contract to that extent.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 157–193; Dec. Dig. § 45.*]

3. REFORMATION OF INSTRUMENTS (§ 26*)—CONTRACTS—PARTIES.

Where an owner granted a right of way to a railroad company on the understanding that it should grant switching privileges, a switching contract between the owner's tenant and the company, supported by a consideration furnished by the owner, was for his benefit, and, though he was not a party to the contract, he was entitled to the benefit thereof. and his assignee could sue to reform the contract; the conveyance of the right of way and the switching contract constituting but one instrument.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 91–100; Dec. Dig. § 26.*]

4. CONTRACTS (§ 164*)—CONSTRUCTION.

All papers constituting or intended to constitute a written agreement must be read together as one.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 746–748; Dec. Dig. § 164.*]

5. CONTRACTS (§ 187*)—RIGHTS OF THIRD PERSONS.

Where an owner of land granted a right of way to a railroad company pursuant to the understanding that the railroad company would switch cars from furnaces located on the land, a separate switching contract between the owner's lessee and the company was for the benefit of the owner within the rule that a contract may be enforced by one for whose benefit it was made.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 798–807; Dec. Dig. § 187.*]

6. CONTRACTS (§ 187*)—RIGHTS OF THIRD PERSONS.

Where an owner granted to a railroad company a right of way pursuant to an understanding that the company would switch cars from blast furnaces located on the land, a switching contract between the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

company and the owner's lessee was supported by a consideration paid by the owner, who had direct rights under it, entitled to enforce it.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 798–807; Dec. Dig. § 187.*]

7. RAILROADS (§ 72*)—COVENANTS RUNNING WITH LAND—SWITCHING CONTRACTS—RIGHTS ACQUIRED.

Where a contract between a railroad company, obtaining a right of way from the' owner of land, and the owner and his lessee, stipulated for switching rates from two furnaces located on the owner's land, the covenant in the contract ran with the land, and a subsequent lessee of the land and his assignee was entitled to the benefits thereof.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 168–178; Dec. Dig. § 72.*]

8. RAILROADS (§ 72*)—RIGHT OF WAY—ACCEPTANCE OF CONDITIONS.

A railroad company accepting a right of way grant must perform the conditions annexed to the grant constituting its consideration, though it has not signed the grant.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 168–178; Dec. Dig. § 72.*]

9. RAILROADS (§ 139*)—RIGHTS OF WAY—CONTRACTS BY TENANT—RIGHTS ACQUIRED.

Where a tenant of a part of the landlord's land has trackage rights and terminal storage privileges on the remainder, the tenant, occupying the remainder, has sufficient interest therein to procure for the entire land a covenant with the railroad company running with the land, inuring to the benefit of the landlord and his future tenants.

[Ed. Note.—For other cases, see Railroads, Dec. Dig. § 139.*]

10. EASEMENTS (§ 26*)—CONTRACTS BY TENANT—RIGHTS ACQUIRED.

A tenant of premises occupied by it may secure a permanent easement for his own benefit and for the benefit of the landlord over adjacent lands, in which neither had any interest, which easement will, on the termination of the tenancy, inure to the benefit of the landlord as a covenant running with the land.

[Ed. Note.—For other cases, see Easements, Dec. Dig. § 26.*]

11. JUDGMENT (§ 562*)—CONCLUSIVENESS—DISMISSAL.

The bringing of an action at law on a contract which results in a nonsuit or discontinuance or anything short of a determination on the merits does not bar a subsequent action to reform the contract and for relief on the reformed contract.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1009; Dec. Dig. § 562.*]

12. ELECTION OF REMEDIES (§ 10*)—ACTS CONSTITUTING.

A party bound by electing his remedy must at the time of making the election have knowledge of the facts from which the inconsistent rights arise, and, to constitute a conclusive election as to the legal effect of an instrument, the party chargeable therewith must at the time he brings an action at law thereon have full knowledge of the legal effect to deprive him of the right to maintain a subsequent action to reform the instrument on the ground of mutual mistake as to its legal effect.

[Ed. Note.—For other cases, see Election of Remedies, Cent. Dig. § 13; Dec. Dig. § 10.*]

13. EQUITY (§ 71*)—"LACHES."

The doctrine of laches as a defense to a suit in equity implies something more than a mere lapse of time; and, to constitute a defense, it must be unreasonable.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 204–211; Dec. Dig. § 71.*

For other definitions, see Words and Phrases, vol. 5, pp. 3969–3972: vol. 8, p. 7700.]

14. REFORMATION OF INSTRUMENTS (§ 32*)—TIME TO SUE—LACHES.

A suit in equity to reform an instrument may be brought at any time within the statutory limit of 10 years, unless a delay results in prejudice to the adverse party or there is such a change of situation as will make it inequitable to grant relief.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 119–121; Dec. Dig. § 32.*]

15. REFORMATION OF INSTRUMENTS (§ 32*)—TIME TO SUE—LACHES.

A suit to reform a contract executed in 1896 brought nearly 10 years thereafter is not barred by laches, the rights claimed by plaintiff under the contract as reformed not having been denied until 1899 and 1900, and an action at law having been begun in 1901 and the suit in equity having been speedily instituted after the action at law had terminated adversely to plaintiff.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 119–121; Dec. Dig. § 32.*]

Action by Frank B. Baird against the Erie Railroad Company and others to reform a contract. Judgment for plaintiff.

Bissel & Riley, George C. Riley, Simon Fleischmann, and Robert F. Schelling, for plaintiff and defendants Union Iron Co. of Buffalo and Buffalo Union Furnace Co.

Moot, Sprague, Brownell & Marcy, Adelbert Moot, and Helen Z. M. Rodgers, for defendant Erie R. Co.

MARCUS, J. This action is brought by plaintiff as assignee of the rights and claims of the Union Iron Company of Buffalo and of the Union Iron Works, Buffalo, N. Y., to secure the reformation of an instrument, dated February 24, 1896, granting certain switching rates, and wherein the defendant the Erie Railroad Company is named as party of the first part, and the Buffalo Furnace Company party of the second part, and for the recovery of switching charges in excess of those stipulated, paid, under protest, to the railroad company. Plaintiff asks that the clause in the second paragraph and near the beginning of said agreement, whereby the switching rates given are limited to two "furnaces operated by the party of the second part," shall be amplified so as to apply to furnaces when operated by parties other than the Buffalo Furnace Company, the party of the second part, and thus accord with the last clause inserted at the end of said contract, just before its execution, which provided that "if the said furnaces, or either of them, shall be operated by other parties than the Buffalo Furnace Company, said parties so operating shall have the benefit of the switching rates named herein during the term of this contract."

The ground upon which plaintiff seeks such reformation is that the first of the above clauses was left in said contract after the new clause was added, under a misapprehension by all of the parties thereto, as to the legal effect of the two when read together; it being mutually understood that the newly inserted clause was intended to give the switching rates to two furnaces, if operated by parties other than the Buffalo Furnace Company, as well as when operated by that company, and that plaintiff and his predecessors in interest did not

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

learn of, and were not chargeable with knowledge of, the legal effect of such contract, as it was allowed to stand, with both clauses left in, until the courts, in an action at law, brought upon the contract as it was, to recover excessive freight charges, determined that the switching rates under the contract, as it stood, were available only to furnaces operated by the Buffalo Furnace Company, or its technical successors, or assignees. In the action at law, a nonsuit was granted, which was affirmed on appeal by the Appellate Division. Thompson v. Erie R. R. Co., 96 App. Div. 539, 89 N. Y. Supp. 92.

[1] In entering upon the consideration of this case, the court has in mind the proper and well-established rule that, to enable a plaintiff to succeed in an action for reformation, his proof must amount to more than a bare preponderance of evidence, which leaves the issue in doubt; that it must be clear, unequivocal, satisfactory, and convincing. Southard v. Curley, 134 N. Y. 148, 155, 31 N. E. 330, 16 L. R. A. 561, 30 Am. St. Rep. 642; Nevius v. Dunlap, 33 N. Y. 676.

[2] A brief survey of the facts disclosed upon the present trial is necessary to afford a proper basis for a consideration of the legal effect of the evidence and its force. As there is a great similarity in the names of various parties involved, it is necessary to keep the particular title of the different companies constantly in mind.

The defendant the Union Iron Company of Buffalo has during all the times embraced in the present litigation been the owner of a large tract of land of about 52 acres in the southeasterly portion of Buffalo, and its entire tract has been known for many years as "Union Iron Works"; more or less of the premises having from time to time been occupied by blast furnaces. These lands were bounded on the north by two main freight tracks of the New York, Lake Erie & Western Railroad Company, which was afterwards reorganized into the defendant the Erie Railroad Company. Immediately south of these lands was a large tract owned by the railroad company itself, known as Farmer's Point. Mr. Baird, the plaintiff, became interested in the Union Iron Works property prior to 1892, being connected as an officer and stockholder with the company's operating blast furnaces thereon, and in 1892 obtained a 10-year lease of a little less than the southerly half thereof, upon which he completed a blast furnace, thereafter known as "Furnace A." Later on in the same year Mr. Baird organized the Buffalo Furnace Company, one of the parties to the agreement in controversy, and assigned to it his lease. Under this lease the lessee had certain rights to use and lay tracks through, and to store material upon, the remainder of the Buffalo Furnace Company's entire tract of land, lying north of and between its lands and the railroad company's tracks, and practically was in possession of the entire tract until 1896. In the latter part of 1892, negotiations were had between Mr. Baird and Mr. Brunn, the superintendent of the Western Division of the New York, Lake Erie & Western Railroad Company, looking to the acquirement by the railroad company of a double-track right of way southerly from its freight tracks and through the entire tract of land of the Union Iron Company of Buffalo to the lands owned by the railroad company and known as Farmer's Point, lying southerly of the said lands of the Union Iron Company

of Buffalo, in exchange for favorable switching rates to be granted by the railroad company. In the course of these early negotiations, and in January, 1893, a draft of a proposed written agreement was drawn up between the railroad company and the Buffalo Furnace Company, providing for switching rates from the works of said Buffalo Furnace Company to various railroads, which, however, was not accepted by either party, nor ever executed. Mr. Baird had no recollection of this agreement when questioned in regard thereto upon the trial, but it is undisputed that the parties came to no agreement at the time, and that negotiations in regard to the matter were dropped and abandoned on both sides for about two years, and not resumed until 1894 or 1895. Mr. Baird then took up the question anew with Mr. Eben B. Thomas, who was successively first vice president and president of the railroad company, was appointed one of its receivers in April, 1895, and became the president of the reorganized Erie Railroad Company, the defendant herein, November 14, 1895.

Mr. Baird testified that Mr. Thomas visited the property in question with him, and that they saw furnace A of the Buffalo Furnace Company, and that he pointed out to Mr. Thomas where he proposed to erect a second furnace, thereafter known as "Furnace B," upon the northerly portion of the lands of the Union Iron Company of Buffalo. Mr. Baird states that he entered upon negotiations with Mr. Thomas, which finally resulted in an oral agreement made in September, 1895, between the Union Iron Company of Buffalo, the Buffalo Furnace Company, and the railroad company and its receivers, whereby it was agreed that the Union Iron Company of Buffalo, with the consent of the tenant, the Buffalo Furnace Company, should convey to the railroad company a double-track right of way from the railroad company's main tracks, through the lands of the Union Iron Company of Buffalo, to the railroad company's lands south thereof, and that, in consideration thereof, the railroad company should, for 15 years, switch cars to and from two blast furnaces located, or to be located, upon the entire tract of land owned by the Union Iron Company of Buffalo, by whomsoever operated, at certain stipulated rates as to different trunk lines in Buffalo to which such switching should be done. Mr. Baird testifies definitely and clearly as to the elements of this oral contract, which was to be reduced to writing, and Mr. Thomas does not squarely deny the arrangement as detailed by Mr. Baird, but says that it is impossible for him at this distance of time to recall individual conversations. Mr. Thomas, however, states that, after refreshing his memory from the correspondence and papers, his recollection is that there was at the time this arrangement was made one furnace, and that Mr. Baird intended to build another, and he sums up the matter in the following words:

"We were willing to make a switching contract to the Buffalo Furnace and to another one to be built there, but to extend that indefinitely would be to extend that to a cost which we could not estimate, and possibly far beyond its value."

This refusal to extend the switching privileges indefinitely doubtless was in answer to Mr. Baird's original request for rates for three furnaces.

The plaintiff claims that subsequent acts of the railroad company and its receivers and the conduct of all parties concerned, which are entirely or substantially undisputed, corroborate his testimony as to the agreement made between Mr. Thomas on behalf of the railroad company and its receivers and himself as the representative of the Union Iron Company of Buffalo and the Buffalo Furnace Company, and, after careful consideration, the court is led to the conclusion that he sustains his position with convincing force.

Mr. Baird testified that within a few days after making the oral agreement with Mr. Thomas the railroad company prepared and submitted to him a proposed written agreement embodying in a single instrument the grant of the right of way by the Union Iron Company of Buffalo over its lands to the railroad company, and the covenant on the part of the railroad company to give the stipulated switching rates; but, as this proposed contract omitted the names of two of the railroads to which switching was to be done, Mr. Baird returned it for correction in this respect. Mr. Baird further testifies that shortly thereafter he met Mr. Thomas at his office in New York City, and that Mr. Thomas said that he would have to change the form of the contract in a manner that would not make any difference to any of the parties, but that he desired it put into two separate instruments, one granting the right of way to be recorded, and the other containing the switching part of the agreement to be kept unrecorded, as he did not wish to place on record and thereby give publicity to the switching rates.

Mr. Thomas denies that he objected to making the switching rates a matter of public record, but Mr. Baird's version of this phase of the matter seems reasonable, and is corroborated by other circumstances which tend to show that Mr. Thomas's recollection on this point is faulty. However, this detail is not of particular importance, as it is undisputed that the right of way grant and the switching agreement were, by consent, to be separated and reduced to writing in separate instruments, and there is no substantial dispute as to the development and sequence of the various papers thereafter drawn, or that they were all prepared in the first instance by the railroad company and its representatives. The next step in reducing to writing the oral agreement that had been made is found in the separate instrument, dated October 4, 1895, and acknowledged on various dates thereafter, the last acknowledgment being dated November 4, 1895, whereby the Union Iron Company of Buffalo, with the consent of the Buffalo Furnace Company, granted the right of way to the New York, Lake Erie & Western Railroad Company and its receivers and their successors and assigns. The parties named in this grant are the Union Iron Company of Buffalo, the Buffalo Furnace Company, the New York, Lake Erie & Western Railroad Company, and J. G. McCullough and Eben B. Thomas, as receivers of the said railroad company; and all of said parties formally executed and acknowledged the same. The consideration expressed is the nominal sum of $1 and the various preambles therein recited; but it is conceded by all parties that the large and substantial consideration for this grant was the favorable switching rates agreed to be given by the railroad company. Mr. Baird

claims that this grant of right of way was left in November, 1895, with a representative of the railroad company in escrow, and that it was not to be deemed delivered until the railroad company delivered the switching agreement which it was to prepare. It appears, however, that the railroad company recorded this conveyance on January 17, 1896, some weeks before the switching agreement was delivered. This premature recording is not of moment at this time, as its delivery must be deemed to have been subsequently ratified by the parties thereto. After the original delivery of the right of way grant by Mr. Baird to the railroad company, Mr. Baird, as well as Hanna & Co., of Cleveland, who were interested in the Buffalo Furnace Company, promptly demanded of the railroad company, through Mr. Thomas, the written switching agreement which had been agreed upon, with the result that the railroad company prepared a draft between it and Mr. Baird personally, which was promptly rejected, as Mr. Baird was not personally a party to the agreement.

Thereupon a second draft of a proposed switching agreement was prepared by the railroad company, the parties to which were stated to be the reorganized Erie Railroad Company and the Union Iron Company of Buffalo, the owner of the entire tract of land involved, and which agreement was substantially correct, and provided that the stipulated switching rates should apply to two blast furnaces upon the lands of the Union Iron Company of Buffalo, and, further, that:

"The Buffalo Furnace Company or other parties leasing said premises from the Union Iron Company of Buffalo, shall be entitled to the benefits of the switching rates named herein during the life of this contract."

There was omitted, however, from this draft, probably through inadvertence, a provision that the switching rates should be operative from October 4, 1895, the date of the switching grant, and there were also omitted two of the railroads to which the switching rates should apply. This draft of the agreement, prepared by the railroad company itself, with the incidental corrections referred to, carried out the actual prior oral agreement of the parties, and would doubtless have been executed but for the intervention of Mr. Brunn and Mr. Merrill, as appears from the further testimony. That such a draft of the switching agreement should have been prepared by the railroad company itself, and should have run directly to the Union Iron Company of Buffalo, before Mr. Merrill's connection with the railroad company, and before Mr. Brunn intervened and suggested objections thereto, is extremely significant, as showing the understanding of Mr. Thomas, of the receivers, and of the railroad company as to the parties who were to have the benefit of the switching rates, viz., the Union Iron Company of Buffalo and its tenants and as corroborating Mr. Baird's evidence and contention that this was distinctly so understood from the outset. This draft of the switching contract was submitted to Mr. Baird for approval and execution, and was also sent to Mr. Brunn, at Buffalo, for his inspection. Mr. Brunn having in mind only the negotiations with Mr. Baird had three years before, in which a draft of a proposed agreement had been drawn up with the Buffalo Furnace Company alone and relating to its works alone, and who evi-

dently had no knowledge of the new agreement, made three years thereafter directly with Mr. Thomas, wrote to the general superintendent of the railroad company in New York City on December 10, 1895, that there must be some mistake in drawing the contract with the Union Iron Company of Buffalo, the owner of the land, and stated that the switching contract was not to run to this company, but to the Buffalo Furnace Company; and he advised that the contract should not be made with the Union Iron Company of Buffalo, because it had some undeveloped property upon which it might in time conclude to erect furnaces, unless the company would consent to limit the switching rates to the business of the Buffalo Furnace Company.

It was at this juncture that the reorganized Erie Railroad Company, the defendant herein, began its active career at the beginning of the year 1896, with Mr. Thomas as president and Mr. William F. Merrill as one of its vice presidents. Mr. Thomas turned over to Mr. Merrill the papers, including Mr. Brunn's letter, and the drafts of proposed contracts that had thus far been made, as well as the matter of closing up the switching part of the agreement. As Mr. Merrill did not enter the service of the railroad company until January 1, 1896, he had no personal knowledge of the terms of the agreement that had theretofore been made between the old railroad company and its receivers and the Union Iron Company of Buffalo and the Buffalo Furnace Company. The greater or less confusion incident to the reorganization of the railroad company at its very inception, and the lack of knowledge on the part of Mr. Merrill as to what had preceded, may, in some measure, account for the further delay and misunderstanding on his part which arose in connection with this switching agreement. Mr. Merrill, having before him Mr. Brunn's letter, and looking after the interests of the company with which he had just become identified, determined to act upon Mr. Brunn's advice, and he refused to execute the contract directly with the Union Iron Company of Buffalo, the owner of the land, which had been prepared, and stated to Mr. Baird that he would only make the switching agreement with the Buffalo Furnace Company; the company then operating the furnace upon the lands of the Union Iron Company of Buffalo. Mr. Baird strenuously and persistently refused to accept any switching contract, the terms of which should not be in compliance with the oral agreement theretofore made, and which should not inure to the benefit of two furnaces located, or to be located, anywhere upon the lands of the Union Iron Company of Buffalo and by whomsoever operated. Thereupon Mr. Merrill prepared various successive drafts of such switching contract, in form, between the Erie Railroad Company and the Buffalo Furnace Company, which contained various variations as to certain of the railroads included, the time when the switching rates should go into effect and as to other details, all of which, however, were corrected, upon the suggestion of Mr. Baird, so as to conform to, and embody, the terms of the original agreement which Mr. Baird claimed had been made with Mr. Thomas in regard thereto. The draft prepared by Mr. Merrill prior to the one of February 24, 1896, which was finally executed, was in the same language as this final one, with the exception of some immaterial words stricken

out by Mr. Merrill and with the exception of the final clause added in pencil by Mr. Wilbur, the president of the Union Iron Company of Buffalo, and which became a part of the final draft of February 24, 1896, as eventually executed. This draft, immediately preceding the final one executed, was drawn between the Erie Railroad Company and the Buffalo Furnace Company, and provided, in its second paragraph, near the beginning thereof, as had some of the prior drafts, that the railroad company would switch cars at the specified rates from "the furnaces operated by the party of the second part, located in the southerly part of the city of Buffalo, in the county of Erie and state of New York, commonly known as the Union Iron Works." The last clause at the end of this draft provided that the rights, obligations, and privileges thereby conferred should inure to the successors or assigns of the respective parties. The draft in this form was taken by Mr. Baird to Mr. Wilbur, at Bethlehem, Pa., where Mr. Wilbur resided, and Mr. Wilbur refused to accept the switching agreement in this form, upon the ground that it limited the switching privileges to two furnaces to be operated by the Buffalo Furnace Company, or its successors or assigns; whereas, the agreement that had been made with Mr. Thomas provided that the switching privileges should be for the benefit of two furnaces upon the lands of the Union Iron Company of Buffalo, by whomsoever operated, or, in other words, should be for the benefit of the Union Iron Company of Buffalo, the owner of the land and its assigns and tenants. Mr. Wilbur then wrote out a pencil clause, intended to carry out his contention as to the original contract, to the effect that, "if the said furnaces or either of them shall be operated by other parties than the Buffalo Furnace Company, said parties so operating shall have the benefit of the switching rates named herein during the term of this agreement," and insisted that such clause be added to the contract, if the railroad company desired to have the contract, in form, with the Buffalo Furnace Company.

Mr. Baird thereupon returned to New York, and reported to Mr. Merrill that Mr. Wilbur and he insisted upon the switching rates being for the benefit of two furnaces upon the Union Iron Works property by whomsoever operated, and stated that Mr. Wilbur had inserted a clause to cover that point, and that, if Mr. Merrill would not consent to add that clause, the deal was off. Mr. Baird testifies that Mr. Merrill replied that that was what he (Mr. Baird) had been asking for all the time and what he (Mr. Merrill) had thus far refused to give him, but that he would consent to it, and that he was thereby giving him what he had asked for, and that he hoped he was satisfied. Mr. Merrill not only does not deny this testimony of Mr. Baird's, but, when crowded by the railroad company's own counsel on the proposition as to whether he could go any further than not remembering the conversation, says: "It may have been—it may have been; but he got that clause."

So far as the important question of fact involved in this case is concerned, as to whether the railroad company and the Union Iron Company of Buffalo and the Buffalo Furnace Company all intended, supposed, and understood that the switching agreement executed by

the railroad company and the Buffalo Furnace Company on February 24, 1896, gave the switching rates, therein provided, to two furnaces upon the lands of the Union Iron Company of Buffalo, by whomsoever operated, it seems to me that plaintiff has established this fact in his favor by clear and convincing evidence and by the inferences reasonably and necessarily to be drawn therefrom. Other undisputed facts and circumstances leading to this conclusion are not wanting. One of the early drafts of the proposed switching agreement prepared by the railroad company, as already pointed out, ran directly to the Union Iron Company of Buffalo, and provided that not only the Buffalo Furnace Company, but other parties leasing the premises from this company, should be entitled to the switching rates. We have here the construction put by the railroad company itself upon the oral agreement originally made, and it is precisely what Mr. Baird and Mr. Wilbur had at all times insisted upon, what Mr. Wilbur covered with the pencil clause finally inserted, and what Mr. Merrill was finally compelled again to yield, after seeking to modify it by intermediate drafts limiting the switching privileges to two furnaces to be operated by the Buffalo Furnace Company. Remembering that the clause in the early part of the contract limiting such switching rates to the Buffalo Furnace Company had been in various drafts, and that Mr. Wilbur's clause was thereafter added at the end of the contract, it is easy to perceive how the modification or striking out of the original limiting clause was overlooked. It is also of consequence to note that while various drafts prepared by Mr. Merrill contained other discrepancies at variance with the oral agreement, such as the omission of certain railroads and the failure to have the switching rates extend back to October 5, 1895, all of these inaccuracies were readily conceded and adjusted to conform to the oral agreement, as claimed by Mr. Baird, and, finally, the only remaining point, viz., the applicability of the rates to two furnaces by whomsoever operated, which, in itself, had been recognized and conceded in the early draft running directly to the Union Iron Company of Buffalo, was also again finally acquiesced in, and presumably provided for, in the instrument eventually executed. The difference between the parties is, indeed, in one sense, slight. While it appears that the early negotiations in 1892 between Mr. Brunn and Mr. Baird resulted in a proposed draft of contract relating only to one furnace of the Buffalo Furnace Company, it is conceded by all parties that under the arrangement subsequently made with Mr. Thomas the number of furnaces was increased to two, and the only point of contention between the parties that has arisen is whether the two must be operated by the Buffalo Furnace Company, or may be operated by the Union Iron Company of Buffalo, or its successors or tenants upon its lands.

As bearing upon the reasonable probability of the actual arrangement being as claimed by Mr. Baird, that the switching rates were to be available to two furnaces, by whomsoever operated, so long as they were located upon the lands of the Union Iron Company of Buffalo, it may be further noted that at the time the oral agreement was made the Buffalo Furnace Company had one furnace in operation, which

occupied not only the southerly part of the lands of the Union Iron Company of Buffalo, particularly leased to it, but spread its operations practically over the remaining lands of the Union Iron Company of Buffalo, upon which it had certain trackage and storage privileges. Moreover, the lease from the Union Iron Company of Buffalo to the Buffalo Furnace Company, in existence at the time the oral agreement was made, was dated June 1, 1892, and was only for a period of 10 years; whereas, the switching privileges were to continue for 15 years from October 4, 1895, or over 7 years after the leasing period terminated. This circumstance makes it, at least, improbable that the Union Iron Company of Buffalo would grant a right of way through its entire property and exact a switching privilege for 15 years for the sole purpose of having the same apply only to furnaces which, even if there had been room for two furnaces upon the limited piece of land definitely then under lease to the Buffalo Furnace Company, could only be used as matters then stood for less than 8 out of the 15 years contracted for. Above all, there is the pencil clause itself inserted after everything else had been disposed of and reduced to typewriting, providing specifically that, "if the said furnaces, or either of them, shall be operated by other parties than the Buffalo Furnace Company, said parties so operating shall have the benefit of the switching rates named herein during the term of this agreement," and the circumstances under which this clause was insisted upon by Mr. Baird and Mr. Wilbur and finally acquiesced in by Mr. Merrill. In view of the refusal of Mr. Merrill, through several proposed drafts of the agreement, to insert this provision and his final consent thereto, it seems to me beyond reasonable dispute that the purpose of this clause was to make provision for the operation of the furnaces by parties other than the Buffalo Furnace Company, just as it states, and that all parties so intended and understood its purpose, and that none of them then appreciated or apprehended that it would, in the future, be construed as restricted by the clause in the earlier part of the contract, which was left undisturbed, limiting the switching rates to such furnaces as should be operated by the Buffalo Furnace Company or its technical successors or assigns. With the history of the development of the final draft of the switching agreement of February 24, 1896, as disclosed, for the first time upon the trial of this suit in equity, before the court, it is difficult to conceive that the clause added by Mr. Wilbur and consented to by the railroad company could have had any other intent or purpose than to make the contract grant precisely the privilege of the switching rates to two furnaces by whomsoever operated, or that it was not so understood by both parties, and that the failure to make the prior clause conflicting with this new clause conform to it, was not the result of a mutual mistake, inadvertence, and oversight. After the oral agreement had been made in the fall of 1895, Mr. Baird secured an extension of the existing lease of the Buffalo Furnace Company property for five years from June 1, 1902, the termination of the existing ten-year lease, and this extension lease is dated October 4, 1895, the date of the right of way grant from the Union Iron Company of Buffalo

to the railroad company. This lease of October 4, 1895, was surrendered on May 13, 1898, and a nine-year lease from June 1, 1902, given in place thereof. It appears that Mr. Baird, at the time of negotiating the oral agreement with the railroad company for switching rates in 1895, had an agreement or understanding with the Union Iron Company of Buffalo for a lease to him of the northerly part of the property of the Union Iron Company of Buffalo, which fact was communicated to Mr. Thomas, and that in 1897 he actually began the construction of furnace B on that portion of the property, although he did not obtain a formal written lease thereof until May 13, 1898, when a formal lease was executed for 13 years from June 1, 1898, which expired a few months after the 15-year period of the switching agreement. All these leases, covering the premises occupied by furnaces A and B, were in July, 1899, assigned to a new corporation known as Union Iron Works, Buffalo, N. Y., with the consent of the Union Iron Company of Buffalo, and this new company operated furnace B during the period in which the railroad company refused to allow to furnace B the switching rates provided in the switching contract of February 24, 1896. The railroad company allowed the stipulated switching rates to furnace A, operated by the Buffalo Furnace Company, so long as this company operated this furnace, but upon the completion of furnace B and its operation by the Union Iron Works, Buffalo, N. Y., it refused to allow the stipulated rates to furnace B and insisted upon higher rates, which were paid, under protest, during the years 1899 and 1900, and which excess over these stipulated rates amounted on the shipments made to nearly $18,000, to recover which, with interest, this action is brought upon the reformed contract.

In November, 1900, both furnaces A and B were sold to a new company known as the Buffalo Union Furnace Company, whereupon the railroad company allowed the stipulated switching rates to both furnaces A and B until about the year 1906, when the Hepburn interstate commerce law was passed, under which the railroad company has since claimed it has no right longer to allow such rates to either furnace. In December, 1901, the receiver of the Union Iron Works, Buffalo, N. Y., into whose hands the company had passed, began an action at common law upon the switching contract, as it stood unreformed, to recover the amount of the excess of switching charges that had been paid under protest. The plaintiff in that action sought upon the trial to show by parol evidence that the clause making the switching rates applicable to two furnaces by whomsoever operated was understood and intended to apply to furnace B, notwithstanding the clause in the beginning of the contract, limiting such rates to furnaces operated by the Buffalo Furnace Company. The trial court held that parol evidence was not admissible in an action at law for that purpose, and that the restricted clause at the beginning of the contract must be given force and effect, and would not be deemed modified or extended by the clause at the end of the contract. The plaintiff was nonsuited and appealed to the Appellate Division, Fourth Department, where the judgment was affirmed and no further appeal taken. Thompson v. Erie Railroad Company, 96 App. Div. 539, 89 N. Y.

Supp. 92. An examination of the opinion in the Appellate Division will show that that court in the first place did not regard the parol evidence sought to be introduced admissible under the complaint as it stood, and that the contract, "measured and tested alone by its written terms," did not secure the switching rates for furnace B. The court did not have before it the history of the development of this switching contract and its various clauses, but simply the instrument in its entirety, and, taking it as it stood, conjectured that:

"The object of the draftsman in formulating said clause [the Wilbur final clause] probably was to emphasize the idea that the benefits of said contract should be extended to any person who might be operating a furnace as assignee of the corporation named [meaning the Buffalo Furnace Company]."

The evidence now produced and admissible in the present action for reformation clearly shows that this surmise did not accord with the facts as now disclosed, but that, on the contrary, this clause was added after the remainder of the contract had been written out, and that its express purpose was to extend the benefits of the switching rates, not merely to successors or assigns of the Buffalo Furnace Company, the corporation named, as there was already a clause in the contract extending its privileges to such successors and assigns, but that such final clause, prepared by Mr. Wilbur, was expressly intended and understood to extend such privileges to two furnaces when operated by parties other than the Buffalo Furnace Company, and that the parties misapprehended the legal effect of the new clause added at the end thereof, when it should be read in connection with the original clause at the beginning thereof, limiting its privileges to furnaces operated by the Buffalo Furnace Company.

Various incidental proceedings were had in the action at law subsequent to its determination by the Appellate Division, and the action at law was not finally disposed of until the fall of 1905. The Union Iron Company of Buffalo and the Union Iron Works, Buffalo, N. Y., then formally assigned all of their rights to the plaintiff, Mr. Baird, who thereupon commenced the present action on September 12, 1905, within ten years of the date of the right of way grant and switching agreement, and within six years of the time of the payment of the excess switching rates under protest, so that plaintiff is well within the statutes of limitations applicable to the suit, either on its equitable or legal side.

The vital question of fact being thus resolved in favor of the plaintiff, and the equities, as well as the legal rights of the plaintiff, under the contract, as it is sought to be reformed, addressing themselves with persuasive force to the court, it only remains to be considered whether there are any substantial legal or controlling technical grounds for denying relief to plaintiff. The railroad company contends that there can be no reformation of the contract in suit, because neither the plaintiff nor his assignors were parties to it. While this is doubtless a correct statement of an abstract principle, it does not seem to me to be applicable to the situation in this case for various reasons.

[3] In the first place, the Union Iron Company of Buffalo, the owner of the land, and one of the plaintiff's assignors, is to be re-

garded as a party to the entire agreement made, as it, in fact, was between it and the furnace company and the railroad company. Indeed, there could have been no such agreement, without the Union Iron Company of Buffalo as a party thereto, as that is the company that owned the land and deeded the right of way through its land to the railroad company. This is further shown by the fact that the Union Iron Company of Buffalo is one of the parties specifically named in, and who executed that part of the entire agreement between the parties, by which the right of way was granted to the Erie Railroad Company, and which instrument was delivered to, received, and recorded by the railroad company. The Union Iron Company of Buffalo is thus the party to the entire agreement, which furnished substantially the whole of the valuable consideration for that part thereof represented by the switching contract of February 24, 1896. It was therefore unnecessary for the Union Iron Company of Buffalo to sign that part of the agreement embodied in the switching contract, so long as that instrument shows, by its terms, that it was intended for the benefit of the Union Iron Company of Buffalo, as well as for the Buffalo Furnace Company, as it was intended to show and will show, when reformed.

[4] It is elementary law that all of the papers constituting or intending to constitute a written agreement must be read and considered together and as one, and are to be construed in their entirety and with reference one to another. Thompson v. Erie R. R. Co., 96 App. Div. 539, 542, 89 N. Y. Supp. 92; Juilliard v. Chaffee, 92 N. Y. 536; 1 Greenleaf on Evidence, § 284a; Hutchins v. Hebbard, 34 N. Y. 24; Coddington v. Davis, 1 N. Y. 186; Hathaway v. Payne, 34 N. Y. 92, 100; Wright v. Douglass, 7 N. Y. 564, 573; Miller v. Carpenter, 68 App. Div. 346, 348, 74 N. Y. Supp. 231.

[5] Even if the switching agreement of February 24, 1896, be considered as an instrument by itself, it seems to me that, when reformed, it will inure to the benefit of the Union Iron Company of Buffalo and its successors and assigns, including its tenant, the Union Iron Works, Buffalo, N. Y., upon the well-established doctrine that a contract between parties therein specifically named may be enforced by a third party or parties for whose benefit it shows it was made, although such third parties do not execute it nor are designated therein by name, provided they are indicated so as to be capable of identification and bear a certain relationship to the parties named, entitling them to its benefits. The relationship of the Union Iron Company of Buffalo to the parties named in the switching contract and its subject-matter is clear. It, as has been shown, furnished the large and valuable consideration for the switching contract. It also appears that under the lease from the Union Iron Company of Buffalo to the Buffalo Furnace Company in existence at the time the switching contract was made the Buffalo Furnace Company not only had rights to the premises specifically leased to it, but also had trackage and storage rights through and upon that portion of the premises of the Union Iron Company of Buffalo, thereafter leased to the Union Iron Works, Buffalo, N. Y., and occupied by furnace B, and that the landlord was to have

an increased rental above that regularly provided, if the price for the produce of furnace A should exceed a given amount per ton. The tenant also paid the taxes and assessments upon the entire property. Under all of these circumstances, the Union Iron Company of Buffalo was related to, and in privity with, the parties specifically named in the switching contract, so that, under the general reference therein to third parties, it and its tenants were entitled to the benefit thereof, when reformed, as it seems to me, under a long line of well-established authorities in this state. Lawrence v. Fox, 20 N. Y. 268; Pond v. New Rochelle Company, 183 N. Y. 330, 76 N. E. 211, 1 L. R. A. (N. S.) 958; Vrooman v. Turner, 69 N. Y. 280, 25 Am. Rep. 195; Dilcher v. Nellany, 52 Misc. Rep. 364, 102 N. Y. Supp. 264, affirmed, 129 App. Div. 932, 114 N. Y. Supp. 1125, without opinion, and in Court of Appeals without passing directly on merits; Coster v. Mayor, 43 N. Y. 399, 411; Barlow v. Myers, 64 N. Y. 41, 43, 21 Am. Rep. 582.

[6] It is doubtless the law, however, that the fact that the Union Iron Company of Buffalo paid the consideration for the switching privileges granted by the Erie Railroad gives it direct rights under the switching contract, as being, in effect and in law, a direct party to that agreement, so that it need not invoke the third party doctrine at all, though its claim can doubtless be sustained upon that theory, with a large margin in its application, in its favor.

[7] The right of the plaintiff as the assignee of the Union Iron Company of Buffalo and of the Union Iron Works, Buffalo, N. Y., to recover under the contract, when reformed, can also be sustained, it seems to me, upon the theory that the covenant for the switching rates was one running with the entire tract of land of the Union Iron Company of Buffalo. This company has at all times been the owner of the entire tract in question, and granted the right of way to the railroad company through its entire tract, and was a party to the instrument granting such right of way. All of the parties to the entire contract, viz., the railroad Company, the Buffalo Furnace Company, and the Union Iron Company of Buffalo, by the practical construction put by them upon the agreement, even as it stands unreformed, have agreed that the switching rates applied to two furnaces wheresoever located upon the entire tract of the Union Iron Company of Buffalo, provided only that they were operated by the Buffalo Furnace Company or its assigns, as these switching rates were given to furnace B for about six years after 1900, from which time furnace B was operated by the newly organized company, the Buffalo Union Furnace Company, which had acquired, by assignment, the rights of the switching contract from the Buffalo Furnace Company. In view of this fact, there can be no doubt as to the geographical extent of the switching covenant, and that it was to apply to two furnaces, wheresoever located upon this entire tract. With the contract reformed, so as to give the benefits of the switching rates to two furnaces, so located anywhere upon this entire tract and by whomsoever operated, it must be clear that if the covenant was originally one running with the entire lands, with the single proviso that the furnaces must be operated by the Buffalo Furnace Company or its assigns, the covenant

will simply be amplified, without changing its character, under the contract as reformed, so as to inure to the benefit of two furnaces, so located, by whomsoever operated.

It only remains to be determined, therefore, whether the switching covenant is to be regarded as one running with the land, and, as to that, it seems to me there can be no reasonable doubt. That being so, the Union Iron Works, Buffalo, N. Y., as the lessee of a portion of the lands of the Union Iron Company of Buffalo, was entitled to the benefits of the switching covenant, and the plaintiff, as assignee of. both, succeeds to these rights. In Anderson's Law Dictionary, it is said that:

"A covenant runs with the land when, either the liability to perform it—that is, its burden—or the right to take advantage of it—that is, its benefit—passes to the assignee of the land."

It is not necessary to enter upon a lengthy discussion to show that the covenant in question is without doubt one running with the land, and a mere citation of some of the leading authorities sustaining this position will suffice. Cockson v. Cock, Cro. Jac. 125, 1 Smith's Leading Cases, p. 180, and notes; Avery v. N. Y. C. R. R. Co., 106 N. Y. 142, 12 N. E. 619; Dexter v. Beard, 130 N. Y. 558, 29 N. E. 983; Aikin v. A. V. & C. R. R. Co., 26 Barb. 289; Post v. West Shore R. R. Co., 50 Hun, 301, 3 N. Y. Supp. 172. And it·is well settled that such a covenant, being incident to the land, is binding upon, and runs in favor of, those who subsequently acquire an interest in such lands, even where such subsequent parties are not named in the covenant, and without any assignment thereof to them. Norman v. Wells, 17 Wend. 149; Wooliscroft v. Norton, 15 Wis. 198; Durnherr v. Rau, 135 N. Y. 219, 32 N. E. 49; Root v. Wright, 84 N. Y. 72, 38 Am. Rep. 495; Burr v. Beers, 24 N. Y. 178, 80 Am. Dec. 327.

[8] The railroad company, in accepting the right of way grant, even if it had not signed the same, became bound to perform whatever conditions were annexed to the grant and which constituted its.consideration in whole or in part. See Avery, Aikin, and Post Cases, above cited. These conditions were formulated in the so-called switching agreement of February 24, 1896, but doubtless inured to the benefit of the Union Iron Company of Buffalo, when that company furnished and delivered the consideration therefor to the railroad company, which it did by the right of way grant of October 4, 1895. In this connection it is to be remembered, though not vital to the validity of the claim of plaintiff as the assignee of the rights of .the Union Iron Company of Buffalo, that it was shown upon the trial that a duplicate original of the switching contract of February 24, 1896, was upon its execution delivered to the Union Iron Company of Buffalo.

Having in mind in this connection that the original grant of right of way and the switching agreement are to be considered as one entire agreement to which the Union Iron Company of Buffalo was a party, there was no necessity for the execution of the switching agreement by any of the parties other than the railroad company, which created the. covenant for the benefit of the land; whereas, the signatures of the Union Iron Company of Buffalo and of the Buffalo Furnace Com-

pany were necessary to the granting of the right of way instrument, they being the owner and tenant, respectively, of the premises granted, and both of these parties did execute said grant. As the switching agreement, when reformed, will make the rates thereby provided applicable to two furnaces upon the entire premises, by whomsoever operated, it was not necessary to designate, by name, the parties for whose benefit this covenant was made, as, indeed, could seldom be done in the case of continuing covenants running with the land. It must follow that, whoever so operated the furnaces in question, through rights acquired from the owner of the land for whose benefit the covenant was made, will be entitled to the advantages thereof as a covenant running with the land.

[9] Even if the switching contract of February 24, 1896, as reformed, be considered a contract by itself, it doubtless, for other reasons, creates a covenant running with the entire tract of land owned by the landlord, the Union Iron Company of Buffalo. As has been shown, the Buffalo Furnace Company, one of the parties executing this contract, at the time of its execution and prior thereto, held a lease of the southerly portion of the entire premises, which lease, however, gave to this company certain permanent trackage rights and terminable storage privileges over the remainder of the lands of the Union Iron Company of Buffalo, afterwards occupied by furnace B, and it further appears that the Buffalo Furnace Company was in actual possession of the entire tract at the time the switching contract was made and for some time thereafter. Under the authorities, as I interpret them, the Buffalo Furnace Company therefore had sufficient interest in that portion of the premises upon which furnace B was thereafter constructed and operated, under its existing lease with the Union Iron Company of Buffalo, to procure for the entire premises a covenant running with the land, which would thereafter inure to the benefit of the landlord and his future tenants; and the force of this argument is enhanced by the fact that the landlord furnished the consideration for such covenant in the right of way granted, and which traversed the landlord's entire premises.

[10] Even if neither the Union Iron Company of Buffalo nor the Buffalo Furnace Company had any interest or rights in the lands adjoining those of the Buffalo Furnace Company, it appears to be settled that the Buffalo Furnace Company could nevertheless merely as a tenant of the premises occupied by it secure a permanent easement for its own benefit, and that of the landlord, over the adjoining lands in which neither had any interest, which easement would, upon the expiration of the tenancy, inure to the benefit of the landlord as a covenant running with the land. Dempsey v. Kipp, 61 N. Y. 462, and cases there cited. Such claim would obviously be stronger in favor of the common owner of both parcels of land involved. I am therefore satisfied that, under the facts and circumstances of this case, the contract between the parties, as it was intended and as it is to be reformed to conform to such intention, creates a covenant running with the entire lands of the Union Iron Company of Buffalo, and was for the benefit of two furnaces located anywhere upon said lands and by whom-

soever operated, where such operating parties acquired their rights as tenants or otherwise from the owner of the lands, the Union Iron Company of Buffalo, and that the Union Iron Works, Buffalo, N. Y., as such tenant and operating company, was entitled to the benefit of the switching rates provided for in this covenant, and that plaintiff, as the assignee, succeeded to these rights.

The railroad company contends that the bringing of the original action at law by the receiver of the Union Iron Works, Buffalo, N. Y., upon the switching contract as it stood unreformed, amounted to an election of remedies which bars the present action for reformation and relief under the reformed contract, citing, in support of its position, Steinbach v. Relief Company, 77 N. Y. 498, 33 Am. Rep. 655, affirming 12 Hun, 640; Washburn v. Great Western Co., 114 Mass. 176; and other cases in other jurisdictions. I have carefully examined these authorities, and am satisfied that they are based upon the theory of res adjudicata, rather than the doctrine of election of remedies, as it appears in those cases that the plaintiff insisted on forcing the actions to a decision upon the merits, as distinguished from suffering merely a nonsuit, as was the case in the action at law between the parties now before this court.

[11] On the contrary, it appears to be well settled that the bringing of an action at law upon a contract which results in a nonsuit or a discontinuance, or anything short of a determination upon the merits, after both sides rest, will not be a bar to a subsequent action to reform the contract and for relief upon the reformed contract. Equitable Co. v. Hearne, 20 Wall. 494, 22 L. Ed. 398; Northern Company v. Grandview Company, 203 U. S. 106, 27 Sup. Ct. 27, 51 L. Ed. 109; Spurr v. Home Company, 40 Minn. 424, 42 N. W. 206; Hillerich v. Franklin Co., 111 Ky. 255, 63 S. W. 592 (1901); Fisher v. Brown, 111 Ill. App. 492; McCloskey v. McCormack, 44 Ill. 336; Neurenberger v. Neurenberger (Ky.) 29 S. W. 617; Steinbach v. Murphy, 143 Mo. App. 537, 128 S. W. 207 (1910); Anchor Co. v. Walsh, 20 Mo. App. 107; Johnson Co. v. Mo. P. R. R. Co., 126 Mo. 344, 28 S. W. 870, 26 L. R. A. 840, 47 Am. St. Rep. 675. While some of the authorities in holding that an adverse judgment in an action at law upon a contract bars a subsequent suit for reformation use expressions tending to show that the doctrine of the election of remedies was in the mind of the court, a careful examination of these cases will, I think, show that they were decided upon the ground that the judgment in the prior action was one upon the merits, and that a new action under these circumstances for reformation was inconsistent with the adjudication in the prior action which, when so crowded to final determination upon the merits, constituted in a sense a conclusive election of remedies.

[12] The theory of the technical doctrine of election of remedies is that a party chargeable therewith must at the time the election was made have had knowledge of the facts from which the coexisting inconsistent remedial rights arise, and it is held that the bringing of an action which he erroneously supposes affords him a remedial right and in which plaintiff is defeated because of the error does not constitute a conclusive election, so as to preclude the bringing of a subse-

quent suit which will afford him a remedy.  15 Cyc. 261, and cases there cited; Sullivan v. Ross, 113 Mich. 311, 71 N. W. 634, 76 N. W. 309; Spread v. Morgan, 11 H. L. Cas. 588, 615 (11 Eng. Reprint, 1461).  It is indeed settled in this state that, to constitute a conclusive election of remedies as to the legal effect of an instrument, the party chargeable therewith must be shown, at the time he brings an action at law thereon, to have had full knowledge of such legal effect, to deprive him of the right to maintain a subsequent action to reform said instrument upon the ground of mutual misapprehension as to its legal effect.  The knowledge of such legal effect of the instrument, as it stands, is in itself deemed a fact, with knowledge of which the party seeking relief is not chargeable, until such legal effect has been determined in the first action.  Barnard v. Gantz, 140 N. Y. 249, 35 N. E. 430; Henry v. Herrington, 193 N. Y. 218, 222, 86 N. E. 29, 20 L. R. A. (N. S.) 249.  If this were not the law and a person were always chargeable with knowledge of the legal effects of an instrument from the moment he executed it, there could never be an action to reform such an instrument upon the ground of the mutual misapprehension of its legal effect, and this entire and well-recognized ground of equitable jurisdiction would itself disappear.  So far as the form of the judgment of nonsuit in the prior action at law is concerned, that could not be a bar to any subsequent action, even were the cause of action the same, as it is provided by section 1209 of the Code of Civil Procedure that a final judgment dismissing the complaint does not prevent a new suit for the same cause of action, unless it was upon the merits.  While the doctrine of the election of remedies is a common-law doctrine, doubtless applicable in proper cases, notwithstanding the above Code provision, I am satisfied, for the reasons stated, that there was no such conclusive election of remedies in this case as to constitute a legal bar to the present suit.

The railroad company also claims that relief should be denied plaintiff on the ground of laches, as distinguished from the technical defense of the statute of limitations, claiming that the contract sought to be reformed was executed in February, 1896, and that this action was not begun until nearly 10 years thereafter, the period of the statute of limitations applicable thereto.  It appears, however, that the switching rates were not denied to furnace B until 1899 and 1900, and that the action at law was begun in 1901, with reasonable promptness, and the present action, in turn, was likewise speedily instituted after the action at law and the subsequent proceedings therein were terminated.

[13, 14] However, the doctrine of laches as a defense to a suit in equity implies something more than mere lapse of time, and, to constitute a defense, it must be unreasonable.  The question of laches is to be decided upon the particular circumstances of each case, and a suit in equity for reformation may be brought at any time within the statutory limit of 10 years, unless the delay has resulted in prejudice to the adverse party, or such a change of situation as would make it inequitable to grant relief.  16 Cyc. 152; Platt v. Platt, 2 Thomp.

& C. 25, affirmed 58 N. Y. 646; Avery v. Equitable Society, 117 N. Y. 451, 23 N. E. 3.

[15] In view of these general principles, it seems to me that the plaintiff and his assignors have not been guilty of laches, depriving them of the relief sought in this action. In reaching the conclusion that the plaintiff is entitled to recover in this action, the court, sitting as one in equity, is impressed with the justice of plaintiff's claim, the conclusion being quite irresistibly forced upon the mind from the evidence in its entirety that all of the parties to the switching contract at the time it was executed intended and understood that the switching rates should inure to the benefit of two furnaces upon the entire tract of land of the Union Iron Company of Buffalo, by whomsoever operated, in consideration of the right of way obtained by the railroad company from the common owner and landlord, and that the refusal of the railroad company to accord these privileges to furnace B, when it came into existence in 1899, was an afterthought, and based upon a technical construction of the early clause of the switching agreement, limiting the privileges to two furnaces to be operated by the Buffalo Furnace Company, or its successors and assigns, and which clause, it seems to me, the plaintiff has clearly established, was inadvertently allowed to remain in the form in which it stood, after the clause giving such right to two furnaces by whomsoever operated had, upon the insistence of Mr. Baird and Mr. Wilbur, been added to the instrument at the end thereof, upon the mutual understanding and statement that this new clause formulated the original contract and intention of the parties on this point and under a mutual misapprehension of the legal effect of said two clauses, when read together.

The conclusion having thus been reached, that the merits of the controversy are with the plaintiff and that there are no legal obstacles in the way of affording him relief, and there being no dispute as to the amount in controversy, it follows that judgment must be ordered in favor of the plaintiff for the amount claimed in the complaint, with interest and costs.