JOHN M. KELLOGG, J. (dissenting). The plaintiff was married to Guy Strock in 1878, and they lived together for 21 years, and had five children, two of whom are now living. In 1898 he left her. In April, 1907, he returned to her, and they lived together as husband and wife, and she was pregnant by him. She discovered that he was paying attention to the defendant. She called upon the defendant August 28, 1907, informed her that she and her husband were living peaceably together, and that she was pregnant by him, was weak and needed his care and attention, and she wished the defendant would let him alone. She promised that she would give no further trouble and that she would let him alone. On the 28th day of September following he again left her. In October he was seen working upon the defendant's farm, and was living there apparently as a hired man. On January 12th he and the defendant went to Missouri and were married, and then returned to the farm where she previously resided.

There is no reasonable dispute in the evidence as to these facts. I think they show that the defendant enticed the plaintiff's husband away and has committed a grevious wrong towards her. By remaining with the plaintiff, this poor laboring man only had a wife; by going with the defendant, he not only had a wife, but a farm and a home. If Buchanan v. Foster, 23 App. Div. 542, 48 N. Y. Supp. 732, is antagonistic to these views, I do not feel like following it. I think the defendant clearly liable upon the evidence, and the only question is one of damages.

I favor a reversal, upon the ground that the judgment is against the evidence.

---

BAIRD v. ERIE R. CO. et al.

(Supreme Court, Appellate Division, Fourth Department. December 29, 1911.)

1. REFORMATION OF INSTRUMENTS (§ 18*)—SWITCHING CONTRACT—MISTAKE OF LAW.

Where an owner granted a right of way to a railroad, and it was the understanding and intention of the parties, in executing a switching contract with the owner's tenant for two furnaces "operated by it," that the contract should cover two furnaces on the premises by whomsoever operated, and should be for the benefit of the premises and for the interests of the owner, but, as written, the contract, through a mistake of law, did not effect that understanding and intention, equity at the suit of the assignee of the owner, who had subsequently taken over and operated one of the furnaces, will reform the contract.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. §§ 72, 73; Dec. Dig. § 18.*]

2. REFORMATION OF INSTRUMENTS (§ 7*)—INSTRUMENTS WHICH MAY BE RE-FORMED—STATUTE OF FRAUDS.

It will not preclude reformation of a writing that the contract to which it is to be conformed rests in parol, so as to be within the statute of frauds, since, when reformed, the contract will no longer rest in parol.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. § 20; Dec. Dig. § 7;* Frauds, Statute of, Cent. Dig. § 267.]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date,·& Rep'r Indexes

3. CONTRACTS (§ 187*)—PARTIES—RIGHTS OF THIRD PERSONS—"BENEFIT."

Where an owner of land granted a right of way to a railroad company, with the understanding and intention that the company would perform switching services for two furnaces located on the land, a switching contract between the owner's lessee and the railroad was for the benefit of the owner, within the rule that a contract may be enforced by one for whose benefit it is made.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 798–807; Dec. Dig. § 187.*

For other definitions, see Words and Phrases, vol. 1, pp. 750–752.]

4. CARRIERS (§ 202*)—INTERSTATE COMMERCE—CONTRACT—EVIDENCE.

Evidence, in an action to recover the amount of overcharge paid to a railroad upon a switching contract, making special rates for that service, *held* not to show that any of the shipments handled by the railroad were interstate shipments.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 202.*]

5. REFORMATION OF INSTRUMENTS (§ 1*)—NATURE AND SCOPE OF REMEDY.

A court of equity, in reforming an instrument on the ground of mistake, seeks to ascertain and act upon conditions as they actually were at the time of the trial, and not the conditions at the beginning of the litigation, and a contract, when reformed, is not a new contract, but is the actual contract made by the parties dating back to the time that the original contract was made.

[Ed. Note.—For other cases, see Reformation of Instruments, Cent. Dig. § 1; Dec. Dig. § 1.*]

6. CONSTITUTIONAL LAW (§ 191*)—CARRIERS (§ 2*)—STATUTES—CONSTRUCTION—RETROACTIVE OPERATION.

The public service commissions law (Laws 1907, c. 429), which makes special rates or rebates by railroads unlawful, and forbids their payment or allowance, was not intended to have a retroactive effect to deprive a party of his right of action already accrued to recover damages for the breach of a contract for special rates, legal at the time the breach occurred.

[Ed. Note.—For other cases, see Constitutional Law, Dec. Dig. § 191;* Carriers, Dec. Dig. § 2.*]

7. REFORMATION OF INSTRUMENTS (§ 45*)—EVIDENCE—SUFFICIENCY.

Evidence, in a suit to reform a contract for special switching rates for furnaces on a tract of land, *held* to amount to that clear and satisfactory proof of mistake required in actions for reformation and to show that all the parties understood and intended that the switching rates were to apply to two furnaces located on the tract by whomsoever operated.

[Ed. Note.—For other cases, see Reformation of Instruments, Dec. Dig. § 45.*]

McLennan, P. J., dissenting.

Appeal from Equity Term, Erie County.

Action by Frank B. Baird against the Erie Railroad Company, impleaded with the Union Iron Company of Buffalo and Buffalo Union Furnace Company. From a judgment for plaintiff, entered after the trial at an Equity Term of the Supreme Court (72 Misc. Rep. 162, 129 N. Y. Supp. 329), the Erie Railroad Company appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Adelbert Moot (Helen Z. M. Rodgers, on the brief), for appellant. Simon Fleischmann and George C. Riley, for respondent.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes.

ROBSON, J.   Plaintiff's recovery represents the amount of over-charge paid by the Union Iron Works, Buffalo, N. Y., a corporation, to the defendant Erie Railroad Company, for switching service between the 13th day of September, 1899, and the 10th day of October, 1900.   This claim was assigned by the receiver of the former company to plaintiff.   The action is brought by plaintiff as such assignee and also as assignee of the rights and claims of the Union Iron Company of Buffalo under the contract hereinafter referred to.   If a recovery of any sum is warranted, the amount is not in controversy.

The defendant Union Iron Company is an old company, which as far back as 1870 owned, and still owns, a large tract of land in the southeastern part of Buffalo, which has long been known, and is now known, as the Union Iron Works.   This land lies south of and adjoining the Erie tracks, and south of and adjoining this parcel is the Farmers' Point parcel owned by the Erie Railroad Company. The Union Iron Company in about 1892 leased to plaintiff the southerly portion of its lands.   Plaintiff for some time before that had actively interested himself with the purpose of developing, or rather reviving, active business on the whole parcel, which had then reached a low ebb under the management of the owner and others formerly interested in the various enterprises there represented.   Largely through his active instrumentality, a blast furnace was erected on the leased premises and put in operation; the company taking and conducting that business being the Buffalo Furnace Company, to which plaintiff assigned his lease.   This company began operations early in 1893.   He was an officer of the company.   We do not deem it necessary to detail the various relations which the witness Thomas bore to the present defendant, Erie Railroad Company, and its predecessor the New York, Lake Erie & Western Railroad Company, either as receiver and president of the latter, or as president of the former.   It is sufficient to say that he was at all times fully authorized by his position to act for the interests now owned by the Erie Railroad Company.   The company he represented will hereafter be referred to as the "Erie," whatever may have been its actual name at the time.

The Erie had at the time plaintiff began his operations on these premises no access by its lines to its Farmers' Point property.   It was desirous of securing such access.   Plaintiff was desirous of obtaining favorable switching rates for the Furnace Company.   Negotiations looking to those results culminated in a proposed switching rate contract in form between the Erie and the Buffalo Furnace Company. This was only a tentative agreement, and was never executed, though it had the approval of plaintiff and Brunn, the local division superintendent of the Erie.   A tentative right of way agreement giving to the Erie a right of way to the Farmers' Point property across these premises of the Union Iron Company was also prepared, but never executed.   Troubles came thickly upon both the Buffalo Furnace Company and the Erie in that year; and negotiations were suspended until late in 1894, or early in 1895.   Meanwhile plaintiff had in contemplation the erection of another furnace on another parcel of these prem-

ises, referred to as parcel B, distinct and separate from the Buffalo Furnace property. He had several interviews with Thomas, in which, as he testifies, he told Thomas of his plans for building the B furnace. showed him blueprints of the proposed location, and Thomas made suggestions as to an advantageous change in the location of some of the proposed structures. He also testifies that he then told Thomas that the new furnace was not to be controlled by the Buffalo Furnace Company; that it was to be entirely separate from the Buffalo Furnace plant; and that the Union Iron Company, the owner of the land, was to be interested financially to a large amount in the proposed furnace.

If Thomas was so advised at that time, and the court upon satisfactory evidence has so found, it is important in determining the question as to what furnaces the actual agreement as to the switching rates thereafter determined upon it was agreed the rates should apply. Plaintiff testifies that the agreement was that these rates should apply to two furnaces on the premises by whomsoever they might be operated. This is not directly disputed. His purpose in obtaining these rates was manifestly to have them apply to two furnaces, one, that already built and then operated by the Buffalo Furnace Company, and, the other, the one he was then contemplating building on parcel B. It does not appear that the Buffalo Furnace Company then, or thereafter, contemplated building another furnace on the parcel it held under its lease. The switching rate would benefit the Buffalo Furnace Company so far as its plant was concerned, and be of equal advantage to the operators of the proposed plant and incidentally to the landlord, the Union Iron Company, in the increased rental value of its land and the increase in the profits presumably to accrue from its intended investment in the proposed enterprise. Plaintiff for the Union Iron Company at the suggestion of Wilbur, its president, asked for the rate to apply to three furnaces and a steel plant on the property in return for the grant of the desired right of way to the Erie. To this Thomas would not agree. He says, however:

"We were willing to make a switching contract to the Buffalo Furnace and to another one to be built there; but to extend that indefinitely would be to extend that to a cost which we could not estimate, and possibly far beyond its value."

This is at least some corroboration of plaintiff's claim that Thomas then knew that it was proposed to erect another furnace on the premises. Thomas also testifies that the switching privilege, whatever it was that was given to the two furnaces, was the consideration of the granting of the right of way. Shortly afterwards the right of way agreement was made and duly executed. It will be observed that the party who conveyed this right, thus furnishing the large proportion of the consideration for the switching agreement, was the owner of the land, the Union Iron Company. The Buffalo Furnace Company, the lessee, as a party to this contract, consented to the granting of the right of way; but, its right in the premises being limited by the six or seven years then remaining of its lease, its surrender of right was in value inconsiderable in comparison with that conveyed by the Union

Iron Company. It is conceded that the term ultimately agreed upon during which the Erie should do the switching for the two furnaces, one erected and the other to be erected, as we have seen, was 15 years. But the Buffalo Furnace Company's interest in the premises would expire long before the termination of that period. It does not seem probable that either party to the agreement understood that the switching agreement should apply to and be for the benefit only of the Buffalo Furnace Company and its successors and assigns.

This brings us to the decisive question of fact in the case: Did the agreement as made apply only to two furnaces on the premises which were in fact operated by the Buffalo Furnace Company, its successors or assigns, or did it apply to two furnaces on the premises by whomsoever the same might be operated? Though the right of way agreement and the switching contract were unquestionably in effect a single transaction, the one supplying the consideration for the other, the latter was not prepared and finally executed until some three months after the execution of the former. But the fact that some contract' for favorable switching rates was to be given by the Erie was never questioned. Several drafts of such an agreement were prepared by the Erie and submitted for examination. It is noticeable that one of the earlier, possibly the earliest, of these drafts which it prepared, was in form between the Erie and the Union Iron Company; and except for some omissions intentional, or mistaken, not affecting the contract in determining what parties should be benefited thereby, this proposed agreement was in form as plaintiff claims Thomas agreed it should be. _This in itself tends to corroborate plaintiff's version of the agreement actually made by the Erie in return for the right of way agreement. But this, or a similar draft of the contract, was forwarded by defendant to Brunn, its division superintendent, at Buffalo; and he at once suggested that the contract should be with the Buffalo Furnace Company, and not the Union Iron Company.

It is apparent from the evidence that Brunn was not then aware of the result of the negotiations following those he had himself in part conducted in 1892–93, nor that an actual agreement had been made, even as to the right of way. Yet at that time the right of way agreement had been fully executed for more than a month. He also suggested leaving out two railroads, to which switching was to be done at the reduced rate, a suggestion that was taken up promptly later by the Erie officials. One of these tentative drafts was also drawn in form between the Erie and plaintiff personally. After considerable dispute and effort to get the switching contract in form, Thomas, for the Erie, turned the whole matter over to Merrill, a new officer of the company having no personal knowledge of any of the prior details. Plaintiff and he had further discussion and dissension; the former insisting that the contract should be in the form agreed upon by Thomas and himself, and Merrill, following Brunn's suggestion, contending that the contract should be with the Buffalo Furnace Company. Finally, late in February, Merrill gave a proposed draft of contract to plaintiff in form like the one finally executed,

except as to a clause thereafter added as a result of an interview between plaintiff and Wilbur, the president of the Union Iron Company. The parties named in the contract were the Erie and the Buffalo Furnace Company. This draft plaintiff took to Wilbur; and they were advised by an attorney to whom it was submitted for instructions that, as drawn, it applied only to two furnaces on the premises which should be operated by the Buffalo Furnace Company, its successors or assigns. This was what Wilbur would not accept, nor was it what plaintiff had agreed to receive, nor Thomas agreed to give, for the right of way agreement. Thereafter Wilbur again took the matter up with plaintiff, and as a result of several efforts added to the draft at the end, and as a part of the last clause of the contract, the words:

"And if the said furnaces or either of them shall be operated by other parties than the Buffalo Furnace Company, said parties so operating shall have the benefit of the switching rates named herein during the term of this agreement."

This addition was manifestly intended to cover two furnaces operated on the premises, even though one or both should not be operated by the Buffalo Furnace Company, or its assigns; and, standing by itself, it would mean that, and would in that regard conform to the verbal contract made between plaintiff and Thomas, when the terms of the right of way agreement and the switching contract were originally agreed upon by them. Plaintiff, as he testifies, took this contract with the added clause to Merrill, explained to him its purpose, and said that Wilbur was willing that the switching contract be made in form with the Buffalo Furnace Company, provided the contract also made it clear that it carried out the terms of the original agreement actually made, and also made it clear that the agreement was for the property of the Union Iron Company on its lands no matter by whom built or operated; and that Wilbur had added the clause above quoted that would cover the point, and if Merrill would not include that the deal was off. Merrill replied:

"That is just what you have been asking all the time and just what I would not give you."

Plaintiff rejoined:

"Well, it is just what Thomas agreed, and it is just what we got, or were to get, when we turned over the right of way contract that you have gone and recorded; and you have been trying to hold me up, first leaving out one railroad and then another, and then two railroads."

He added that the contract must include this clause, or the railroad would have to condemn its right of way through the property. Merrill's reply was:

"Well, well, well; don't get excited about that. I will do it; I will do it. That is giving you what you asked for. I hope to thunder you are satisfied now. This has bothered me more than anything since I have been connected with the road. Baird, you are the greatest fellow to hang onto a thing I ever saw. If I had been making that contract, I would never have made it in the world. I don't believe in those long-term switching contracts. I don't see what those fellows were thinking of, but you have got what you want. I hope you are satisfied."

Plaintiff then in effect said to him that it was simply carrying out the contract made with Thomas; that Wilbur had insisted in the early negotiations on three furnaces and a steel plant, had reduced the demand to two furnaces, and as the railroad had drafted the contract, without the clause added by Wilbur, the new or proposed furnace would be cut out, and that this added clause was Wilbur's ultimatum, and he would agree to nothing else. The agreement which included this clause was then executed. There can be no question, if this actually occurred and the clause was added under the agreement and understanding of both parties that it was for the purpose of effectuating the actual agreement they had made, that the contract was to be for the benefit of the premises, and, for the interests of the Union Iron Company, that the switching contract was to be for two furnaces by whomsoever built and operated, there was a mutual mistake of the parties because the clause did not in fact add this vital part of the actual agreement. Standing alone, it was adequate for the purpose, and clearly expresses the idea intended.

[1] But as this court has held, when a case at law involving the right to recover these same rebates under this same contract was before it, the clause read, in connection with the earlier part of the agreement, which runs to the Buffalo Furnace Company for two furnaces *operated by it* on the premises, limits the effect of the clause to such furnaces as the Buffalo Furnace Company or its successors or assigns should operate there. Thompson, as Recr., v. Erie R. R. Co., 96 App. Div. 539, 89 N. Y. Supp. 92. This, of course, emasculates the clause, leaving it utterly worthless in accomplishing the purpose for which plaintiff and Wilbur insisted on its addition to the contract, and which Merrill at the time it was added understood it did effectuate. We have therefore a clear and definite agreement between the parties, which by inadvertence, or mistake, has not been written into the actual contract as signed. It is clear that the parties intended to include it in the written agreement and supposed they had done so by adding the clause referred to. In this they were both mistaken. This action is in the first instance to correct this mistake. That it is a mistake that equity has full power to correct is certain. The principle here controlling is well stated in Pomeroy's Equity Jurisprudence (3d Ed.) § 845, as follows:

"If, on the other hand, after making an agreement, in the process of reducing it to a written form, the instrument, *by means of a mistake of law*, fails to express the contract which the parties actually entered into, equity will interfere either by way of defense to its enforcement, or by cancellation, or with the appropriate relief, by reformation, to the same extent as if the failure of the writing to express the real contract was caused by a mistake of fact. In this instance there is no mistake as to the legal import of *the contract actually made;* but the mistake of law prevents the real contract from being embodied in the written instrument. In short, if a written instrument fails to express the intention which the parties had in making the contract which it purports to contain, equity will grant its relief, affirmative or defensive, although the failure may have resulted from a mistake as to the legal meaning and operation of the terms or language employed in the writing."

132 N.Y.S.—62

This statement of the law is fortified by citations from the decisions of the courts of this and other states. See, also, Curtis v. Albee, 167 N. Y. 360, 60 N. E. 660; Fulton v. Colwell, 112 Fed. 836, 50 C. C. A. 537.

[2] It is urged by appellant's counsel that the contract, under which plaintiff claims, being in fact only in parol, the statute of frauds is a defense. The apparent answer to this is that the parties supposed the contract had been expressed in the written instrument, in which they were mistaken; and plaintiff now asks the court to declare the intention of the parties by correcting the written instrument, thus making it what they supposed it was. When the correction is made, the contract will no longer rest in parol. 34 Cyc. 927.

[3] It is also claimed that because the written instrument in question is under seal, and the Union Iron Company, one of plaintiff's predecessors in interest, was not in fact named as a party to it, even if it had not assigned its interest therein, it could not now claim under the contract. But, though not named in the contract, the actual agreement was that the Union Iron Company should have the benefit of the agreement as a covenant attached to and running with its land. To that extent the contract was made for its benefit. It also furnished the material consideration therefor, as has already been pointed out, and under the doctrine of Lawrence v. Fox, 20 N. Y. 268, and kindred cases, it, or its assignee, is entitled to claim the benefits of the contract as made, which would include the right to have the written contract reformed. It is not stranger to the contract. Nor does the fact that the contract is under seal prevent the application of the rule. Coster v. Mayor of Albany, 43 N. Y. 399, 411; Haack v. Weicken, 118 N. Y. 67, 23 N. E. 133.

[4] Appellant's counsel asserts that relief should be denied in this action because, if granted, it would in effect make defendant allow rebates on freight charges; whereas, both state and federal law for years have made special rates, or rebates, unlawful, and forbidden their payment or allowance. The effect of the federal statutes may properly be eliminated from consideration, because there is no proof that any of the shipments, overpayments for which are represented in the recovery, were interstate shipments. The Erie in switching to the different roads acted wholly within the state, and its whole connection with any of these shipments was apparently intra and not inter state.

[5, 6] The state law referred to, the public service commissions law (chapter 429 of the Laws of 1907), was not passed until years after the right to recover the overcharges had matured, and this action had actually been begun. It is further urged that the passage of these acts should be now accepted as indicating that a rebating contract was inherently wicked, and therefore a court of equity should not lend its aid to support that unclean thing. That a court of equity seeks to ascertain and act upon, not conditions as they were at the beginning of a litigation, but as they actually are at the time of the trial, is doubtless true. But there was no condition, i. e., no statute nor any equitable principle, which, when the contract was violated

by the Erie, declared, or pointed to, the fact that it was not legal. The contract when reformed is not a new contract, but is the actual contract made by the parties. The correction necessarily dates back to the time that the original contract was made. 34 Cyc. 999. This law was not intended, and probably could not in any event have been made, to have the retroactive effect of depriving plaintiff of his right of action already accrued to recover damages for the breach of a contract legal at the time the breach occurred.

[7] One of appellant's chief contentions is that plaintiff has failed to produce that clear, convincing, and satisfactory proof of mistake required in actions for reformation. The claim in this regard is that it rests on the testimony of one witness, and that witness the plaintiff. But, as we view the case, the plaintiff's statements are amply supported by facts and circumstances about which there can be no dispute, some of which have been already referred to. Plaintiff's claim is based upon the fact that the contract was in fact principally made with, and for the benefit of, the Union Iron Company, and not solely for the benefit of the Buffalo Furnace Company. This is both so natural and probable that in and of itself it is persuasive. The sole consideration for the switching contract was the right of way transfer. The large and valuable part of this consideration necessarily came from the owner of the premises, the Union Iron Company. Naturally, therefore, it would for its own material advantage seek to have the benefit of the contract apply to the two furnaces, which might be on the property, by whomsoever built or operated.

It would also seem that practical construction has been given to the contract indicating that such was its intended effect. During the time these rates were refused to the Union Iron Works of Buffalo, which operated furnace B, defendant claimed that the contract did not apply to that furnace because it was not operated by the Buffalo Furnace Company or its assigns. But as soon as this furnace, together with the Buffalo Furnace plant and property, were taken over by a new corporation called the Buffalo Union Furnace Company, the contract rates were extended· to this new company as to both furnaces, and continued down to the time when it first made a claim that rebating had been prohibited by law. The new company took the Union Iron Works furnace in direct succession to its rights therein, not as assignee, or successor, of the Buffalo Furnace Company. If appellant's present position is tenable, it is not apparent why these rates were extended to furnace B under its new management. It may also be observed that there is no direct denial of plaintiff's testimony as to his conversations and negotiations with Thomas and Merrill. The latter, when asked by defendant's counsel in reference to the important and practically decisive conversation, when it was agreed that Wilbur's memorandum should be included in the contract, whether such conversation took place, after testifying that he did not remember any such conversation at all, replies to the question "Can you go farther than that?" "It may have been—It may have been, but he got that clause." And this is the clause which, standing alone, would be conclusive in favor of plaintiff's claim.

The questions involved in this appeal have been thoroughly and ably discussed in the learned opinion delivered by Mr. Justice Marcus at Special Term, reported in 72 Misc. Rep. 162, 129 N. Y. Supp. 329. The conclusions which the court has there stated, as will be seen on examination of the opinion, are well sustained both by reason and authority.

The appeal from the order granting the additional allowance was not pressed on the argument. The order was properly granted.

The judgment and order should be affirmed, with costs. All concurred, except McLENNAN, P. J., who dissented in a memorandum.

McLENNAN, P. J. (dissenting). The true interpretation and meaning of the contract in question, as written, was determined by this court, 96 App. Div. 539, 89 N. Y. Supp. 92, opinion by Justice Hiscock, in which all concurred. It was held in that case, which was an action at law, that under the terms of such contract the plaintiff was not entitled to recover. This action is brought in equity, seeking a reformation of such contract so that its provisions shall inure to the benefit of the Union Iron Works, plaintiff's assignor.

I think there is no evidence which justifies the conclusion that the parties to the agreement did not know and fully understand its provisions; that there is no evidence upon which fraud can be predicated in the negotiation or execution of such contract. Neither is there any evidence from which it can be said that there was mutual mistake in the execution of such contract by the parties. In other words, in my opinion the record is entirely barren of facts which would justify a court of equity in reforming or changing the contract as it was made and executed by the respective parties.

I therefore conclude that the judgment should be reversed, and a new trial granted, with costs to the appellant to abide event.